IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

EYVONNE WEBER,                                              CV. 10-1053 RE

           Plaintiff,                                     **OPINION AND ORDER**

     v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

           Defendant.

REDDEN, Judge:

Plaintiff Eyvonne Weber ("Weber"), brings this action to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") disability benefits under Titles II and XVI of the Social Security Act. For the reasons set forth

1 - OPINION AND ORDER

below, the decision of the Commissioner is reversed and remanded for further proceedings and this matter is dismissed.

## BACKGROUND

Born in 1972, Weber has completed the 12th grade and an educational certificate in computer spreadsheets from Business Computer Training Institutes. She has worked as a housekeeper and as a cook. In May 2006, Weber filed applications for disability insurance benefits alleging disability since February 1, 2003, due to depression and Post Traumatic Stress Disorder ("PTSD"). Her application was denied initially and upon reconsideration. On June 12, 2009, a hearing was held before Administrative Law Judge ("ALJ") Delaittre. In a decision dated July 8, 2009, the ALJ found Weber not disabled from February 1, 2003 through July 8, 2009. Weber's request for review was denied, making the ALJ's decision the final decision of the Commissioner. Weber now seeks judicial review of the Commissioner's decision.

## ALJ's DECISION

The ALJ found Weber had medically determinable severe impairments of dysthymia, fibromyalgia, and a right rotator cuff injury. The ALJ found that Weber's migraine headaches, PTSD, and personality disorder were not severe. Tr. 11.

The ALJ determined that Weber retained the residual functional capacity to perform a full range of light work, that she could not perform her past relevant work, but that she was able to perform jobs existing in significant numbers.

The medical records in this case accurately set out Weber's medical history as it relates to her claim for benefits. The court has carefully reviewed the extensive medical record, and the

parties are familiar with it. Accordingly, the details of those medical records will be set out below only as they are relevant to the issues before the court.

## DISCUSSION

Weber contends that the ALJ erred by: (1) improperly rejecting the opinions of examining and non-examining physicians; and (2) improperly assessing her residual functional capacity.

### I. The Physicians' Opinions

Disability opinions are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). If no conflict arises between medical source opinions, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). In such circumstances the ALJ should also give greater weight to the opinion of an examining physician over that of a reviewing physician. *Id.* But, if two medical source opinions conflict, an ALJ need only give "specific and legitimate reasons" for discrediting one opinion in favor of another. *Id.* at 830. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

#### A. Consulting Examiner James A. Ewell, Ph. D.

Dr. Ewell examined Weber on January 6, 2003. Weber had demanded that the police remove her two small children from her custody, and the evaluation focused on explicit questions regarding whether Weber might harm her children, her attitude regarding their return to her, and her relationships with men. Tr. 190. In addition to an interview, Weber completed the Wechsler Adult Intelligence Scale, the Thematic Apperception Test, and the MMPI-2.

Dr. Ewell found that Weber demonstrated "an unusual deficiency in areas pertaining to social judgment, interpersonal problem-solving and abstract reasoning." Tr. 199. He diagnosed Major Depressive Disorder, in partial remission, PTSD, Personality Disorder NOS, with Dependent and Passive-Aggressive Features, and assessed a GAF of 47.

The ALJ summarized Dr. Ewell's report and said "[a]lthough scoring showed the claimant could have some trouble in areas pertaining to social judgment and interpersonal problem solving, these deficits would not be profound." The ALJ noted that a GAF score of 65, indicating mild symptoms, was assigned by her treating counselor in January 2008. Tr. 746.

### B. Reviewing Examiner Paul Rethinger, Ph.D.

On August 15, 2006, Dr. Rethinger reviewed Weber's medical records and noted diagnoses of passive/aggressive and dependent personality disorder, major depressive disorder, and symptoms of PTSD. Tr. 505. He found that Weber had moderate limitations in concentration, persistence, and pace, and in social functioning. Tr. 503. Tr. 505. He opined that, since February 1, 2003, "the overall picture here shows a cl[aimant] who has a more than non-severe impairment, but not so severe as to preclude all types of work related activity." Tr. 505. Weber was restricted to simple, routine tasks, and occasional public contact. Tr. 509.

The ALJ cited Dr. Rethinger's opinion and gave it "significant weight" because it was based on a review of the entire record, and the physician is familiar with the Social Security regulations.

/ / /

/ / /

/ / /

### C. Consulting Examiner Gregory A. Cole, Ph.D.

Dr. Cole reviewed Weber's medical records and interviewed her on November 9, 2006. "Throughout the testing...the client exhibited a tendency to give up easily on tasks, and her overall pace on tasks was observed to be slow." Tr. 647. Dr. Cole concluded that:

> The client was able to sustain simple routine tasks, and no problems completing a simple multiple-step task were observed....if the client pursues a vocational placement in the near future, then it is presumed that her problems interacting with others/level of anxiety, and claimed pain problems, would be the primary factors, which would impact her overall level of vocational success. In the latter area, further medical evaluation is suggested to determine the clients's specific physical limitations.

Tr. 649. Dr. Cole diagnosed Major Depression, recurrent, an Anxiety Disorder, History of Cannabis Dependence, and rule out Personality Disorder. He assessed a GAF score of 55.[1]

The ALJ cited Dr. Cole's report several times. He noted Dr. Cole's diagnosis of personality disorder, and that "he opined that even though the claimant displayed some symptoms consistent with a personality disorder, further assessment was needed to determine the appropriateness of this diagnosis.[Citation omitted.] Due to the relatively mild symptoms and the inconclusive diagnoses, the undersigned finds these impairments nonsevere." Tr. 11.

---

[1] 2 The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000)). It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations. *Id* at 34. A Global Assessment of Functioning ("GAF") score between 50 and 60 indicates "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *Id* at 32.

5 - OPINION AND ORDER

In evaluating Weber's mental impairments under the criteria of listing 12.04, the ALJ found she had moderate difficulties in concentration, persistence or pace. Tr. 12. She reported problems concentrating to Dr. Cole, but could complete simple tasks, and reported completing activities requiring concentration, including jigsaw puzzles and reading. *Id.*

The ALJ gave significant weight to Dr. Cole's opinion that Weber could sustain simple, routine tasks and that she could complete simple, multiple-step tasks "because this is consistent with the relatively normal mental status examination and the evidence."

> However, little weight is given to Dr. Cole's opinion that the claimant would have difficulty interacting with others. Dr. Cole admitted that the diagnosis of personality disorder was inconclusive and there is little evidence of an anxiety disorder, outside of the claimant's subjective complaints. He did not elaborate why the claimant would have difficulty interacting with others or provide supporting evidence. Further, he admitted that the claimant's physical problems were entirely subjective; therefore no basis exists for determining that they would interfere with the claimant's ability to work.

Tr. 17.

Weber argues that the ALJ erred by failing to include limitations in her ability to concentrate, persist and keep pace, and social limitations, in the residual functional capacity assessment.

The Commissioner concedes that the ALJ erred by failing to reject or include a limitation identified by a physician in the residual functional capacity. The Commissioner argues that the error was harmless because the ALJ relied on the Medical-Vocational Guidelines (the "grids") which take administrative notice of the number of unskilled jobs in the workforce. 20 C.F.R. pt

404, supt. P, app2 § 200.00(b). Unskilled work is simple work and primarily involves work with objects rather than people. 20 C.F.R. §§ 404.1568(a), 416.968(a).

## II. The Grids

The Ninth Circuit articulated the five-step sequential process for determining whether a claimant is "disabled" in *Tackett v. Apfel,* 180 F.3d 1094, 1098-99 (9th Cir. 1999). The grids are applied at the fifth step of the analysis and present, in table form, a short-hand method for determining the availability and numbers of suitable jobs for a claimant. The grids categorize jobs by their physical exertional requirements, and set out a table for each category. A claimant's placement with the appropriate table is determined by applying a matrix of four factors identified by Congress: a claimant's age, education, previous work experience, and physical ability. For each combination of factors, the tables direct a finding of either "disabled" or "not disabled" based on the number of jobs in the national economy in that category of physical exertional requirements. *Tackett,* 180 F.3d at 1101.

The grids are based on a claimant suffering from an impairment which causes limitations in meeting the strength requirements of jobs, i.e., exertional limitations. Non-exertional impairments, like pain, postural or manipulative limitations (difficulty reaching, handling, stooping) may, if sufficiently severe, limit a claimant's functional capacity in ways not contemplated by the grids. Thus the *Tackett* court held that "[t]he grids should be applied only where a claimant's functional limitations fall into a standardized pattern 'accurately and completely' described by the grids." *Id.* at 1103. This bar on exclusive reliance on the grids is limited by the requirement that the nonexertional impairments must be significant enough to

7 - OPINION AND ORDER

limit further the range of work permitted by exertional limitations, before precluding application of the grids.

When a claimant suffers only exertional limitations, the ALJ must consult the grids. *Lounsburry v. Barnhart,* 468 F.3d 1111, 1115 (9th Cir. 2006). Where a claimant suffers only non-exertional limitations, the grids are inappropriate and the ALJ must rely on other evidence. Because the grids are not designed to establish automatically the existence of jobs for persons with both severe exertional and non-exertional impairments, they may not be used to direct a conclusion of nondisability in that circumstance.

The ALJ erred by failing to adopt or reject non-exertional impairments found by physicians in the ALJ's residual functional capacity analysis. *Carmickle v. Comm'r,* 533 F.3d 1155, 1164 (9th Cir. 2008). The matter must be remanded for further proceedings to address the indicated testimony. If necessary, the ALJ must then revise his RFC determination.

## CONCLUSION

For these reasons, this court REVERSES the Commissioner's final decision and REMANDS this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion and order.

IT IS SO ORDERED.

Dated this 2( day of February, 2012.

JAMES A. REDDEN
United States District Judge

8 - OPINION AND ORDER